# IN THE SUPREME COURT OF THE STATE OF NEVADA

CLAUDIA YESENIA ALVARADO
RAMIREZ,
Appellant,
vs.
JULIO MAURICIO MENJIVAR,
Respondent.

No. 74030

**FILED**

DEC 27 2018

ELIZABETH A. BROWN
CLERK OF SUPREME COURT
BY S. Young
DEPUTY CLERK

## *ORDER OF REVERSAL AND REMAND*

This is an appeal from a district court order in a child custody matter. Eighth Judicial District Court, Family Court Division, Clark County; Cynthia Dianne Steel, Judge.

Appellant Claudia Yesenia Alvarado Ramirez and her daughter, Wendy, fled El Salvador and arrived in Las Vegas, Nevada, in July 2016. Approximately nine months later, on or about March 31, 2017, Ramirez filed a complaint for custody against respondent Julio Mauricio Menjivar, Wendy's father, to whom Ramirez was never married. At the time of filing, Wendy was 17. Menjivar did not file an answer to the complaint, and thus, the district court entered an order of default on May 24, 2017. Thereafter, on June 15, 2017, Ramirez filed a motion for findings on the issue of Wendy's special immigrant juvenile (SIJ) status, citing 8 U.S.C. § 1101(a)(27)(J), for support (referred to as "special" or "SIJ" findings). In the motion, Ramirez argued that the district court qualifies as a "juvenile court" for purposes of the federal SIJ statute.

The district court held a hearing on August 10, 2017, to which Menjivar also failed to appear, so the court issued an order with default findings. The order granted joint legal custody, with Ramirez having sole

physical custody of the parties' daughter. However, the district court declined to make the requested SIJ findings, reasoning that it could not take judicial notice of the complexities of life in El Salvador, and it otherwise lacked a sufficient basis upon which to make the requested factual findings. Instead, the district court attached Wendy's declaration in support of the motion for SIJ findings to the order "for the review of interested parties."[1]

*Whether the district court had jurisdiction to make the requested findings*

Ramirez argues that the district court qualifies as a "juvenile court" that could make the requested findings under 8 U.S.C. § 1101(a)(27)(J) as it undertakes jurisdiction in cases "such as custody, divorce, guardianship, adoption, dependency, and termination of parental rights." Ramirez argues that this is the case even absent the enactment of Assembly Bill 142,[2] which explicitly gave district courts the jurisdiction to make SIJ findings. Ramirez contends that the district court is a "juvenile court" for purposes of the SIJ program because it is defined as a court that has "jurisdiction under State law to make judicial determinations about the custody and care of juveniles." Similarly, the Clinic argues that Assembly

---

[1]After briefing was completed, this court filed an order inviting amicus curiae participation in the case. *Ramirez v. Menjivar*, Docket No. 74030 (Order Inviting Participation by Amici Curiae, July 11, 2018). Amicus curiae the UNLV Immigration Clinic (the Clinic) subsequently filed an amicus curiae brief, which we address as necessary in this disposition.

[2]The Legislature passed Assembly Bill 142 on May 30, 2017, and amended NRS Chapter 3, resulting in NRS 3.2203(1). *See* 2017 Stat. Nev., Ch. 212, § 1, at 1146-47. This amendment became effective on October 1, 2017. *See* NRS 3.2203. Because NRS 3.2203 explicitly grants the district court jurisdiction to make findings for purposes of the SIJ program, this decision applies only to cases before NRS 3.2203's effective date.

Bill 142 merely clarified the confusion surrounding the SIJ program, but "its enactment does not suggest that jurisdiction did not already exist."

Issues regarding subject matter jurisdiction are reviewed de novo. *See Ogawa v. Ogawa*, 125 Nev. 660, 667, 221 P.3d 699, 704 (2009); *Labor Comm'r of Nev. v. Littlefield*, 123 Nev. 35, 39, 153 P.3d 26, 28 (2007). Applying for special immigrant juvenile (SIJ) status entails a multistep process involving both state courts and federal agencies. 8 U.S.C. § 1101(a)(27)(J). First, the child must obtain the following SIJ findings from a "juvenile court":

> (1) the child is dependent on a juvenile court or, under the custody of an agency or department of a State, or an individual or entity appointed by the court or State; (2) reunification with one or both parents is not viable due to abuse, neglect, or abandonment; and (3) returning the child to his or her country of origin would not be in the child's best interest.

*Guardianship of Penate*, 76 N.E.3d 960, 965-66 (Mass. 2017) (citing 8 U.S.C. § 1101(a)(27)(J)). For purposes of 8 U.S.C. § 1101(a)(27)(J), a juvenile court is "a court located in the United States having jurisdiction under state law to make judicial determinations about the custody and care of juveniles." 8 C.F.R. § 204.11(a). The USCIS Policy Manual notes that the term "juvenile court" may be ambiguous because different states have different names for courts that would qualify under 8 C.F.R. § 204.11(A). *See* 6 U.S. Citizenship & Immigr. Servs., Dep't of Homeland Sec., Policy Manual pt. J, ch. 3(A)(1), https://www.uscis.gov/policymanual/HTML/PolicyManual–Volume6–PartJ–Chapter3.html (last visited on December 17, 2018), [hereinafter USCIS Policy Manual].

Second, the immigrant child must file a petition, which includes the SIJ findings made by the "juvenile court," with USCIS. 8 C.F.R. §

204.11. In addition to the SIJ findings, a "special immigrant" must be under age 21 and unmarried to qualify for SIJ status. 8 C.F.R. § 204.11(c). Under this second step, USCIS conducts a plenary review of the petition, and ultimately determines whether to grant SIJ status. *Id.; see also* USCIS Policy Manual pt. J, ch. 3(A)-(B)(1) Thus, the threshold issue is whether the district court below was a "juvenile court" within the meaning of the statute, such that it had jurisdiction to make SIJ findings.

Under the Nevada Constitution, district courts have original jurisdiction in all cases excluded by law from the original jurisdiction of justice courts. Nev. Const. art. 6, § 6(1). The family court was constitutionally established as a division of the district court. Nev. Const. art. 6, § 6(2)(b). Additionally, as a division of the district court, a judge seated in family court is "a district court judge who retains his or her judicial powers derived from the Constitution to dispose of justiciable controversies." *Landreth v. Malik*, 127 Nev. 175, 187–88, 251 P.3d 163, 171 (2011). Under N.R.S. 3.223, the family court division has original and exclusive jurisdiction over matters affecting the familial unit including divorce, custody, marriage contracts, community and separate property, child support, parental rights, guardianship, and adoption. N.R.S. 3.223. Nevertheless, as clarified by *Landreth*, the family court's jurisdiction also extends beyond those matters explicitly outlined in NRS 3.223. 127 Nev. 175, 187–88, 251 P.3d 163, 171 (2011).

Accordingly, the district court had jurisdiction to make the type of findings the USCIS may utilize in determining whether to grant SIJ status, and thus, the district court also constitutes a "juvenile court" for purposes of the SIJ program. *See* 8 C.F.R. § 204.11. However, as described

more fully below, this jurisdiction exists only to the extent those findings are ancillary to proceedings under state law.

*Whether the district court erred by failing to make the requested findings*

Ramirez argues that as a "juvenile court," the district court could enter the requested findings under 8 U.S.C. § 1101(a)(27)(J), and abused its discretion by failing to do so.[3]

Some jurisdictions have relied on state courts' expertise in matters pertaining to children, and the federal government's plenary power over immigration law, in concluding that not only do state courts have jurisdiction to make independent SIJ findings, they are *required* to make the findings due to the unique role that the states play under the SIJ program.[4] Other jurisdictions, however, have determined that the findings

---

[3]Ramirez further argues that the district court improperly delegated its fact-finding role to USCIS by attaching Wendy's declaration to its order "for the review of interested parties." Given our ultimate disposition in this case, we need not address whether there was an improper delegation here, as the district court had the duty to make these findings under state law.

[4]*See Guardianship of Penate*, 76 N.E.3d 960, 966 (Mass. 2017) (holding that because the fact-finding role is "integral to the SIJ process . . . judge[s] *may not decline to make special findings if requested by an immigrant child under [8 U.S.C.]§ 1101(a)(27)(J)*") (emphasis added); *see also H.S.P. v. J.K.*, 121 A.3d 849, 860 (N.J. 2015) (instructing New Jersey courts "to make *separate* findings as to abuse, neglect, and abandonment" based on "the role Congress envisioned for the juvenile courts of the fifty states" so that "USCIS will have sufficient information" to determine whether to grant SIJ status) (emphasis added); *In re J.J.X.C.*, 734 S.E.2d 120, 124 (Ga. Ct. App. 2012) (noting that "[t]he SIJ statute affirms the institutional competence of state courts as the appropriate forum for child welfare determinations regarding abuse, neglect, or abandonment, and a child's best interests," and thus, the "court had a duty to consider the SIJ factors and make findings."); *In re Dany G*, 117 A.3d 650, 655 (Md. Ct. Spec. App. 2015) ("The state juvenile court must make *specific findings of fact*

 

that a district court makes are dictated by state law, and it may make findings relevant to an SIJ application only to the extent they are ancillary to proceedings under state law. We believe the latter view is more persuasive, and adopt the reasoning espoused by *Canales v. Torres Orellana*, 800 S.E.2d 208 (Va. Ct. App. 2017).

In *Canales*, the court grappled with an appeal claiming Virginia courts had a duty to rule on SIJ motions absent a Virginia statute granting the state courts jurisdiction to do so. 800 S.E.2d at 216. In holding that its courts did not have jurisdiction to make SIJ findings independently, it noted that lower courts' jurisdiction in Virginia was prescribed entirely by statute and criticized the growing desire of federal and state courts alike to "discover jurisdiction." *Id.* at 216-17. As the "General Assembly of Virginia ha[d] not authorized the courts . . . to hear petitions for SIJ findings as an independent matter," and because the separation of powers doctrine "prevent[ed] the courts . . . from conveying jurisdiction upon themselves where the General Assembly ha[d] not done so," the *Canales* court concluded that "no such power exists." *Id.* at 217.

The *Canales* court explained that its conclusion was consistent with federal law. It noted that Congress had not created any relevant federal statutory scheme to convey jurisdiction to state courts to participate actively in immigration and naturalization decisions. *Id.* at 217-18. It

---

*regarding the child's eligibility for SIJ status.*" (emphasis added)); *In re Guardianship of Guaman*, 879 N.W.2d 668, 673 (Minn. Ct. App. 2016) (concluding that where the record "contains evidence as to each potential SIJ finding, we conclude that the probate court abused its discretion by declining to consider the request for SIJ findings."). Because these holdings do not persuade us, we reject this line of reasoning.

further noted that 8 U.S.C. § 1101(a)(27)(J) is plainly a definition of special immigrant, and that "it would strain basic principles of statutory construction to infer a grant of jurisdiction from the definition of a term of art."[5] *Id.* Finding 8 U.S.C. § 1101(a)(27)(J) to be only a special immigrant definition, it concluded that "there was no language in any federal statute mandating that state juvenile courts make the SIJ findings." *Id.* at 218. Further, it found that far from a mandate, the SIJ statute did not even

---

[5] 8 U.S.C. § 1101(a)(27)(J) states:

The term "special immigrant" means—

. . . .

(J) an immigrant who is present in the United States—

(i) who has been declared dependent on a juvenile court located in the United States or whom such a court has legally committed to, or placed under the custody of, an agency or department of a State, or an individual or entity appointed by a State or juvenile court located in the United States, and whose reunification with 1 or both of the immigrant's parents is not viable due to abuse, neglect, abandonment, or a similar basis found under State law;

(ii) for whom it has been determined in administrative or judicial proceedings that it would not be in the alien's best interest to be returned to the alien's or parent's previous country of nationality or country of last habitual residence; and

(iii) in whose case the Secretary of Homeland Security consents to the grant of special immigrant juvenile status . . . .

request state courts to make separate or specific findings of fact to aid SIJ applications. *Id.*

The *Canales* court instead concluded that district courts were permitted to make SIJ findings only to the extent those findings were ancillary to proceedings under state law. *Id.* at 218-21. Quoting the language from the USCIS Policy Manual, Ch. 3(A)(2), the court emphasized "[j]uvenile courts should follow their state laws on issues such as *when to exercise authority,* evidentiary standards, and due process." *Id.* at 218. The *Canales* court brought attention to the USCIS's guidance to federal officials (who conduct the SIJ review), that language establishing specific findings should not mirror or cite immigration law and regulations, but should be made under state laws. *Id.* at 218-19. It further highlighted that USCIS guidance provides that "a best interests determination generally involves a deliberation that courts undertake *under state law* when deciding what types of services, actions, and orders will best serve a child, as well as deliberation regarding who is best suited to take care of a child." *Id.* at 218. Comparing Virginia law to 8 U.S.C. § 1101(a)(27)(J), the *Canales* court found that the SIJ statute's first requirement, that an immigrant child show he or she has been "abandoned, abused, or neglected, such that 'reunification with [one] or both . . . parents is not viable,'" was analogous to the manner in which Virginia juvenile courts often determine custody, and that the lower court's application of the Virginia codes to a juvenile court proceeding could conceivably be used to satisfy 8 U.S.C. § 1101(a)(27)(J). *Id.* at 219-20. Thus, it concluded that "[t]o the extent that such questions surface in Virginia custody proceedings, a Virginia court would [thus, need do no more than] turn to the best interests of the child

factors found [under Virginia law]." *Id.* at 219; *see also De Rubio v. Herrera,* 541 S.W.3d at 572-74 (same).

The *Canales* approach is more persuasive for several reasons. First, as pointed out by the *Canales* court, 8 U.S.C. § 1101(a)(27)(J) is a definition section of the federal code, and the SIJ statutes do not mandate or request that state courts make separate or specific findings of fact to aid SIJ applications. *See* 8 U.S.C. § 1101(a)(27)(J); 8 C.F.R. § 204.11. Thus, we agree that, "it would strain basic principles of statutory construction to infer a grant of jurisdiction from the definition of a term of art." *Canales.* 800 S.E.2d at 217-18. Second, refusing to infer a grant of jurisdiction under this term of art avoids possible constitutional issues under the Tenth Amendment and the separation of powers doctrine.[6] Lastly, and as

---

[6]For example, under the Tenth Amendment, "[t]he Federal Government may not compel the States to enact or administer a federal regulatory program." *New York v. United States,* 505 U.S. 144, 157–158 (1992) ("[T]he Tenth Amendment confirms that the power of the Federal Government is subject to limits that may, in a given instance, reserve power to the States."). Thus, even if the federal program contemplates the states' participation, it cannot *force* the states to participate. Also at issue is the separation of powers doctrine. Until recently, the Nevada Legislature was silent on what the state courts were required to do in regards to 8 U.S.C. § 1101(a)(27)(J). Because the Nevada Constitution grants the legislature with the power to establish family courts "as a division of any district court" and to "prescribe its jurisdiction," inferring a grant of jurisdiction under 8 U.S.C. § 1101(a)(27)(J) would also likely encroach on the legislature's exercise of power. *See* Nev. Const. art. 3, § 1 (stating that the powers of the state government "shall be divided into three separate departments" and that, with certain exceptions, "no persons charged with the exercise of powers properly belonging to one of these departments shall exercise any functions, appertaining to either of the others"); *see also* Nev. Const. art. 6, § 6(2)(b) (granting the legislature with the power to establish family courts "as a division of any district court" and to "*prescribe its jurisdiction*") (emphasis added).

explained more fully below, Nevada's statutes and caselaw already require the district court to make findings that would satisfy the findings sufficient for USCIS to determine whether to grant SIJ status. Thus, it is unnecessary to attempt to "discover jurisdiction." *See Canales*, 800 S.E.2d at 217.

Having determined that the correct analysis is whether the district court erred under state law, we proceed to determine whether the district court failed to make required findings under Nevada law.

*Whether the district court abused its discretion under Nevada law by failing to make the requested findings*

Ramirez argues that the district court failed to address Wendy's best interests in making its determination. Similarly, the Clinic argues, "[t]he authority of state courts to make [SIJ] findings derives from their broad authority to rule on the best interests of the children." Because it is "well established that district courts should issue clear and specific factual findings related to children's best interests and it is reversible error when they fail to do so," the Clinic argues that it is error for a district court to categorically refuse to issue SIJ findings.

The district court has broad discretion in making child custody determinations, and its decisions will not be disturbed absent a clear abuse of discretion. *Rico v. Rodriguez,* 121 Nev. 695, 701, 120 P.3d 812, 816 (2005). However, this court must "be satisfied that the district court's determination was made for appropriate reasons," *id.,* and thus, "deference is not owed to legal error, or to findings so conclusory they may mask legal error." *Davis v. Ewalefo,* 131 Nev. 445, 450, 352 P.3d 1139, 1142 (2015) (internal citations omitted).

"In *any* action for determining physical custody of a minor child, the sole consideration of the court is the best interest of the child." NRS

 

125C.0035 (emphasis added); *see Davis,* 131 Nev. at 451, 352 P.3d at 1143 ("In making a child custody determination, 'the sole consideration of the court is the best interest of the child,'" (quoting the prior version of NRS 125C.0035)).[7] This analysis requires "specific findings and an adequate explanation of the reasons for the custody determination," because they "are crucial to enforce or modify a custody order and for appellate review." *Davis,* 131 Nev. at 452, 352 P.3d at 1143 (quoting *Rivero v. Rivero,* 125 Nev. 410, 430, 216 P.3d 213, 227 (2009)). "Without them, this court cannot say with assurance that the custody determination was made for appropriate legal reasons." *Id.*

NRS 125C.0035(4) states that the district court *shall* consider and set forth its specific findings concerning, among other things:

> (a) The wishes of the child if the child is of sufficient age and capacity to form an intelligent preference as to his or her physical custody.
>
>     . . . .
>
> (c) Which parent is more likely to allow the child to have frequent associations and a continuing relationship with the noncustodial parent.
>
> (d) The level of conflict between the parents.
>
> (e) The ability of the parents to cooperate to meet the needs of the child.
>
> (f) The mental and physical health of the parents.
>
> (g) The physical, developmental and emotional needs of the child.

---

[7]NRS 125C.480 was amended in 2015, 2015 Nev. Stat., ch. 445, § 8, at 2583, eff. Oct. 1, 2015. The amendments largely added repealed provisions concerning custody and visitation of children to NRS Chapter 125C. 2015 Nev. Stat., ch. 445,Legislative Counsel's Digest, at 2580.

 

(h) The nature of the relationship of the child with each parent.

(i) The ability of the child to maintain a relationship with any sibling.

(j) Any history of parental abuse or neglect of the child or a sibling of the child.

(k) Whether either parent or any other person seeking physical custody has engaged in an act of domestic violence against the child, a parent of the child or any other person residing with the child.

(l) Whether either parent or any other person seeking physical custody has committed any act of abduction against the child or any other child.

These factors are not exhaustive, and *"[o]ther factors, beyond those enumerated in NRS 125.[0035](4), may merit consideration."* Davis, 131 Nev. at 451, 352 P.3d at 1143 (emphasis added). Indeed, although it is not set forth in the statute, this court has held that a district court must make best interest of the child findings even in cases where living conditions in other countries is at issue. *See Davis*, 131 Nev. at 451, Ne352 P.3d at 1141 (holding that the district court erred by failing to make findings of fact regarding whether visitation to Africa, where one parent worked and resided, was in the child's best interest); *see also Hayes v. Gallacher*, 115 Nev. 1, 3-4, 972 P.2d 1138, 1139-40 (1999) (involving a parent petition to relocate with children to Japan)).

Additionally, this court has indicated that joint legal custody entails certain considerations: "parents [must] be able to cooperate, communicate, and compromise to act in the best interest of the child." *Rivero*, 125 Nev. at 420-21, 216 P.3d at 221. In joint custody arrangements, parents must consult each other to make major decisions regarding the child's upbringing, "while the parent with whom the child is residing at that

time usually makes minor day-to-day decisions." *Id.* at 421, P.3d at 221. If the parents in a joint legal custody situation are unable to agree on major decisions, "then the parties may appear before the court on an equal footing to have the court decide what is in the best interest of the child. *Id.* at 421, 216 P.3d at 221-22 (internal quotation marks and citations omitted).

Here, Ramirez's declaration alleged that the father physically beat her "every day." She asserted that she was afraid of him, and that he would hit her whenever he was upset, and that he would get "angry over small things." Ramirez also stated that he was verbally abusive, and that "[o]n one occasion, he grabbed [her] by the hair and pulled [her] to the mirror. He told [her] to look at how old and ugly [she] was." She also alleged that the father would hit the children, including Wendy, "sometimes for no reason at all." Ramirez also stated that she "finally had the courage to separate from" the father and "did not hear from him again until [she] requested child support from him in 2012." From 2006 to 2012, the father "did not support [her] children in any way," and was absent from their lives. Ramirez finally obtained child support in the form of $30 per month for all three of her children in 2012. Ramirez's declaration also explained the violence that was prevalent in their neighborhood, and country, and that this was the reason that they finally fled to the United States. Wendy's declaration was largely consistent with Ramirez, and alleged that her father physically abused her mother, her sister, and her. Wendy, further asserted that her father was not supportive, and was largely absent from her life. Wendy, further described the gang violence that affected her, and her mother's decision to leave El Salvador.

Faced with these allegations, the district court entered a default decree of custody, granting joint legal custody to the parents, sole

physical custody of Wendy to Ramirez, and ordering Menjivar to pay $100 monthly in child support. However, as this is a child custody matter, the district court was required to make specific findings of fact as to the best interests of Wendy. *See* NRS 125C.0035; *Davis*, 131 Nev. at 451, 352 P.3d at 1143. These were not limited to the factors outlined by statute, and given the facts alleged, included determinations as to: (1) whether it was in Wendy's best interest to return to El Salvador; (2) the nature of Wendy's relationship with her father; (3) any history of neglect or abuse; and (4)"[w]hether either parent . . . has engaged in an act of domestic violence against the child, a parent of the child, or any other person residing with the child. *See* NRS 125C.0035(4).

The district court was also required to make findings regarding whether Ramirez and Menjivar could "cooperate, communicate, and compromise to act in the best interest of the child," as parents in joint legal custody arrangements "must consult each other to make major decisions regarding the child's upbringing." *Rivero*, 125 Nev. at 420-21, 216 P.3d at 221. As it granted sole physical custody, the district court was also required to make findings supporting a determination that joint physical custody was not in Wendy's best interest, NRS 125C.003(1), or to apply the presumption that joint physical custody was not in her best interest. *See id.* Assuming it applied the presumption, the district court failed to make certain relevant findings required under NRS 125C.003. *See* NRS 125C.003(1)-(2) (requiring "substantial evidence that a parent is unable to adequately care for a minor child for at least 146 days of the year," or if a child is born out of wedlock, that the father "has abandoned the child").

Because the district court failed to make these findings, we cannot say with assurance "that the custody determination was made for

 

appropriate legal reasons." *See Davis*, 131 Nev. at 452, 352 P.3d at 1143. This is independent of whether Wendy was entitled to an immigration benefit as a result, although notably, the findings that the district court was required to make would likely satisfy the findings required by the SIJ program and are thus ancillary to the child custody proceedings under state law. *See Canales*, 800 S.E.2d at 218; *compare* NRS 125C.0035(4) *with Guardianship of Penate*, 76 N.E.3d at 965-66 (outlining findings required for potential SIJ status).

Therefore, we

ORDER the judgment of the district court REVERSED AND REMAND this matter to the district court for proceedings consistent with this order.[8]

_____, J.
Cherry

_____, J.
Parraguirre

_____, J.
Stiglich

---

[8]We further hold that while Wendy is over 19 years old at the time of our disposition, the claims are not moot because she was 17 at the time the petition was filed, and because she has a continuing legal benefit to which she may be entitled under the federal SIJ program. *See Gao v. Jenifer*, 185 F.3d 548, 557 (6th Cir. 1999) (holding that that the issue of SIJ findings was not moot where an immigrant was over 21 but had petitioned for SIJ findings prior to turning 21, because by giving the immigrant what he had "requested, namely SIJ status, he receive[d] a meaningful legal benefit—the opportunity to apply to . . . have his status adjusted to that of an alien lawfully admitted for permanent residence").

cc: Hon. Cynthia Dianne Steel, District Judge, Family Court Division
Law Offices of Martin Hart, LLC
Julio Mauricio Menjivar
Michael G. Kagan
Eighth District Court Clerk

SUPREME COURT
OF
NEVADA

(O) 1947A